**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| Terry W. Bracey, ) | C/A No. 3:07-4068-CMC |
| ) | |
| Plaintiff, ) | |
| ) | **OPINION & ORDER** |
| v. ) | **GRANTING MOTION** |
| ) | **FOR SUMMARY JUDGMENT** |
| Robert Ward and Jon E. Ozmint, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

Through this action Plaintiff, a former state employee, seeks recovery under 42 U.S.C. § 1983. Plaintiff alleges that he suffered injuries, including the loss of his earning capacity, because of retaliation by officials with the South Carolina Department of Corrections ("SCDC") for speech protected under the First Amendment, as applied to the states through the Due Process Clause of the Fourteenth Amendment. *See Gitlow v. New York*, 268 U.S. 652, 666 (1925). Plaintiff also asserts a pendent state tort claim for intentional infliction of emotional distress.[1]

This matter is now before the court on Defendants' motion for summary judgment, filed pursuant to Fed. R. Civ. P. 56. For the reasons stated below, the motion is granted in full.

## BACKGROUND

Plaintiff began working for SCDC in 1985. Over a seventeen-year period, Plaintiff worked at several institutions, including Stevenson Correctional Institution, Evans Correctional Institution, Trenton Correctional Institution (then Aiken Youth Center), and Kirkland Reception and Evaluation Center ("R&E"). Dkt. No. 69-1 at 4-10 (Pl.'s WCC Dep. at 13-44). Plaintiff held various positions

---

[1] Plaintiff has also filed a claim with the South Carolina Workers' Compensation Commission. *See* Dkt. No. 62-3 (WCC Trans.) His deposition taken in that action is referred to throughout this order as "Pl.'s WCC Dep."

within those institutions, beginning as a sergeant and eventually serving as lieutenant and captain at multiple institutions.[2] *Id.* In 2001, while a captain at Stevenson, Plaintiff joined what is now called the Rapid Response Team ("RRT"), an agency-wide unit that responds to institutional emergencies across the state, including escapes, hostage situations, and lesser disturbances. *Id.* at 10 (Pl.'s WCC Dep. at 44-45).

**2002 Application for RRT Major.** In January 2002, Plaintiff applied for promotion to the rank of major with RRT. During his final interview for the promotion, in September 2002, one supervisory SCDC official asked Plaintiff whether he would assist in executions of condemned inmates. Dkt. No. 69-1 at 12 (Pl.'s WCC Dep. at 56); Dkt. No. 69-3 at 6 (Pl.'s Dep. at 44-45). According to Plaintiff, there was an implication that the promotion was contingent upon an affirmative response to this question. Dkt. No. 69-1 at 12 (Pl.'s WCC Dep. at 57-58). Plaintiff did not immediately respond, but instead asked to view an execution in order to make up his mind. Plaintiff viewed an execution, but did not offer a definite response to the execution inquiry. Nevertheless, Plaintiff was promoted to major with RRT on October 2, 2002. *Id.* at 13 (Pl.'s WCC Dep. at 64, 66); *see also* Dkt. No. 62-2 at 8-12 (WCC Trans. at 38-42). *But see* Dkt. No. 1 at 2 (Compl. ¶ 7) (stating that, when Plaintiff was promoted to the major position in October 2002, "he was told that in addition to the duties listed in the job description that a requirement of the position would be to act as executioner of death row inmates . . . .").

---

[2] Plaintiff's advancement within SCDC was subject to at least one setback. As a result of an excessive force charge in 1995 or 1996, Plaintiff was terminated from SCDC while serving as a captain at Trenton. Plaintiff filed a state employee grievance in response to this termination. Pursuant to a mediation agreement between Plaintiff and SCDC, Plaintiff was reinstated as an SCDC employee, but was assigned the lower rank of lieutenant and reassigned to Kirkland R&E. Dkt. No. 69-1 at 8-9 (Pl.'s WCC Dep. at 33-36, 39).

**2004 Agreement to Perform Executions.** SCDC officials did not question Plaintiff further about performing executions until early 2004. Plaintiff testified that, at that time, Assistant Division Director John Ferraro notified Plaintiff that Ward "needed [him] to get off the fence," and called him a "punk" because he had not decided whether he would participate in executions. Dkt. No. 69-2 at 13 (Pl.'s WCC Dep. at 64-68). Shortly thereafter, Plaintiff agreed to participate in executions, despite reservations. *Id.* at 14 (Pl.'s WCC Dep. at 71-72).

**2004-2005 Executions and Meetings with Ward.** Plaintiff participated in his first execution in March 2004. *See* Dkt. No. 69-1 at 15 (Pl.'s WCC Dep. at 74-75). Plaintiff notes that SCDC does not require those who participate in executions to receive counseling; however, Plaintiff testified that he voluntarily participated in SCDC's Employee Assistance Program ("EAP"), which provides three counseling sessions to SCDC employees each year. Dkt. No. 69 at 23-25; Dkt. No. 69-2 at 14 (Pl.'s WCC Dep. at 156-57). Plaintiff contends he received no training to serve as an executioner. Dkt. No. 69-1 at 15 (Pl.'s WCC Dep. at 78).

After the first execution, Plaintiff "didn't know how [he] felt about" the execution process. Nonetheless, he eventually noticed psychological effects, such as the desire to wash his hands repeatedly. Dkt. No. 69-2 at 2 (Pl.'s WCC Dep. at 80-81). Plaintiff also began to suffer from nightmares and emotional disturbances. Plaintiff consulted with his pastor regarding these difficulties. Dkt. No. 62-2 at 21 (WCC Trans. at 53). Plaintiff also ordered self-help materials to help him resolve alleged execution-related issues. Dkt. No. 69-2 at 3 (Pl.'s WCC Dep. at 89-90).

In April 2004, within a month after his first execution, Plaintiff and Major Ira Baxley

3

("Baxley")³ met with Director of Operations Robert Ward to inform him that they no longer wished to perform executions. *Id.* at 2 (Pl.'s WCC Dep. at 81-82); Dkt. No. 69-3 at 4-5 (Pl.'s Dep. at 40-42). At that meeting, Ward advised Plaintiff and Baxley that, if they no longer wanted to perform executions, they should select another SCDC employee to assign to the task. Dkt. No. 62-2 at 15 (WCC Trans. at 46). Although Plaintiff was conflicted about assigning another SCDC employee to a task that, he felt, "condemn[ed] [him] to a possible hell," Plaintiff, along with Baxley and Ward, selected other employees to perform executions. *Id.* at 16 (WCC Trans. at 47).

Plaintiff and Baxley again met with Ward regarding their participation in executions, and other issues, in May 2004. During that meeting, Ward explained to Plaintiff that if he no longer wished to perform executions, he could be transferred back to an institution. Dkt. No. 69-2 at 4 (Pl.'s WCC Dep. at 95-96); *see also* Dkt. No. 69-3 at 8 (Pl.'s Dep. at 51-52). Such a transfer would have resulted in the loss of Plaintiff's position as a major with RRT, his emergency response vehicle, and his emergency pay. Dkt. No. 69-2 at 4 (Pl.'s WCC Dep. at 96-97).

The selection of additional executioners had given Plaintiff "a glimmer of hope" that he would no longer be asked to participate in executions. Nonetheless, Ward continued to direct Plaintiff to perform executions through mid-2005. Plaintiff believed, in light of his previous disciplinary experience, that he would lose his job if he did not continue to participate in executions. Dkt. No. 62-2 at 17-19 (WCC Trans. at 48, 50-51).

After participating in an April 2005 execution, Plaintiff began to experience agitation and increased sleeping difficulties, for which he now takes medication. Dkt. No. 69-2 at 6 (Pl.'s WCC

---

³ Baxley was the plaintiff in a related suit, *Baxley v. Ward*, 3:07-04067-CMC. An order granting summary judgment to Defendants in that case was entered on March 16, 2010.

4

Dep. at 99, 105); *see also id.* at 12 (Pl.'s WCC Dep. at 141-44). Plaintiff also began to have marital difficulties at this time. Dkt. No. 62-2 at 23-24 (WCC Trans. at 61-62). Plaintiff claims that he participated in a total of six executions. Dkt. No. 69-3 at 4 (Pl.'s Dep. at 40).

After speaking with at least one other supervisory official, but not with Ward or Ozmint, to complain about participating in executions, Plaintiff was not asked to perform any further executions after April 2005. Dkt. No. 69-2 at 7-8 (Pl.'s WCC Dep. at 111-17); Dkt. No. 69-3 at 8 (Pl.'s Dep. at 52). Plaintiff was never told that he had been removed from the execution team, but by mid-2005, Ward had brought additional employees onto the team. Dkt. No. 62-2 at 25 (WCC Trans. at 64). Plaintiff did not notice a reduction in his pay or authority as a result of this change in his job duties. Dkt. No. 69-2 at 8 (Pl.'s WCC Dep. at 117-18). However, Plaintiff intermittently complained that Ward treated him less favorably after Plaintiff complained about personnel issues unrelated to executions. *Id.* at 8-9 (Pl.'s WCC Dep. at 119-23). Plaintiff felt Ward "belittled," "threatened" and "treated [him] less than a man," which caused him " a certain amount of anguish." *Id.* at 12, 15 (Pl.'s WCC Dep. at 144, 158).

**2006 Hostage Situation.** Plaintiff's duties with RRT required him to respond to hostage situations in the prisons. On November 3, 2006, a male inmate took a female employee hostage at Ridgeland Correctional Institution. During the hostage situation, the female employee was able to inform officers that she had been raped by the inmate. Plaintiff contends that, despite this report, Ozmint did not permit Plaintiff and other officers to enter the institution. Dkt. No. 69 at 4. Plaintiff partially attributes his ongoing psychological disturbances to this incident. Dkt. No. 62-2 at 34 (WCC Trans. at 88). Plaintiff relies on this 2006 hostage incident in support of his claim for intentional infliction of emotional distress. *See* Dkt. No. 69 at 19-22.

5

**2007 Sheedy Computer Incidents.** On at least two occasions in 2007, then-Security Division Director Michael Sheedy called Plaintiff into his office to view what Plaintiff claims was pornography on Sheedy's work computer. *Id.* at 4; Dkt. No. 69-2 at 15 (Pl.'s WCC Dep. at 161). Plaintiff, offended by the images, told Sheedy that he "did not appreciate it nor did [he] want to see that anymore." *Id.* Thereafter, Sheedy did not share any other pornographic images with Plaintiff. *Id.*

In February 2007, Baxley entered Sheedy's office and videotaped images from Sheedy's computer. Baxley also took still photographs. Dkt. No. 62-2 at 47 (WCC Trans. at 130). Plaintiff did not help Baxley gather these images, but he was aware that Baxley planned to collect the evidence, and he saw Baxley enter Sheedy's office to carry out this plan. Dkt. No. 69-2 at 15 (Pl.'s WCC Dep. at 163); *see also* Dkt. No. 62-2 at 47 (WCC Trans. at 130).[4] Plaintiff later participated in a meeting, ostensibly about other issues, in which Baxley showed the images he had collected to Ferraro, who was Plaintiff and Baxley's immediate supervisor. Dkt. No. 69-2 at 16 (Pl.'s WCC Dep. at 164).

Plaintiff had no further involvement with the images collected by Baxley or any related internal investigation. *Id.* (Pl.'s WCC Dep. at 165); Dkt. No. 69-3 at 10-11 (Pl.'s Dep. at 59-62). Plaintiff's only additional involvement with the pornography incident occurred in April 2007, during

---

[4] In his deposition in this case, Plaintiff testified that he was "present" when Baxley recorded the images from Sheedy's computer. In his earlier deposition related to his Workers' Compensation claim, Plaintiff testified that he merely "[saw Baxley] going to the room to do it." *Compare* Dkt. No. 69-3 at 11 (Pl.'s Dep. at 60-61) *with* Dkt. No. 69-2 at 15 (Pl.'s WCC Dep. at 163). Thus, though Plaintiff was present at work and was aware of Baxley's intention to gather the images, the record suggests that he was, at most, a passive participant in Baxley's investigation. *See id.* (Pl.'s WCC Dep. at 162-63) (stating that Baxley told Plaintiff that he intended to record the pornographic images from Sheedy's computer).

pendency of *Anthony v. SCDC*, C/A No. 3:05-1636-MBS-BM. Both Plaintiff and Director of Operations Ward were involved with the case.[5] Prior to Ward's testimony, Plaintiff notified Ward about the evidence Baxley took from Sheedy's computer. Plaintiff testified that he told Ward about the incident "in fairness to him, really briefly. This was prior to him going in to make a testimony, and I told him out in the hallway." Dkt. No. 69-2 at 16 (Pl.'s WCC Dep. at 165-66); Dkt. No. 69-3 at 3 (Pl.'s Dep. at 65).

**End of Employment with SCDC and Medical Disability Application.** Plaintiff has a number of medical conditions, including diabetes, high cholesterol, a fluttering heart, difficulties sleeping, depression, and post-traumatic stress disorder, for which he takes a number of medications. *See* Dkt. No. 69-2 at 9 (Pl.'s WCC Dep. at 123-27). Plaintiff also has an longstanding neck injury, potentially related to an off-duty car accident, for which he has sought physical therapy. *Id.* at 11, 14 (Pl.'s WCC Dep. at 135-36, 152).

On the advice of his physician, Dr. Green B. Neal, Plaintiff decided to seek health-related retirement in May 2007. *Id.* at 9, 13 (Pl.'s WCC Dep. at 126, 151); *see also* Dkt. No. 62-2 at 46 (WCC Trans. at 128). Plaintiff's final day of work at SCDC was on or about May 22, 2007. Dkt. No. 69-2 at 11 (Pl.'s WCC Dep. at 138). Sometime prior to May 2007, Plaintiff petitioned the South Carolina State Retirement System for medical disability retirement. Plaintiff's disability retirement petition was granted in December 2007. *Id.* at 13 (Pl.'s WCC Dep. at 148-49).

---

[5] Plaintiff's precise level of involvement with the *Anthony* case is unclear. When asked whether he was a witness in *Anthony*, Plaintiff answered that he "didn't actually witness anything other than just a participant with the Rapid Response Team on a tactical search." Dkt. No. 69-2 at 16 (Pl.'s WCC Dep. at 166). Court records, of which the undersigned may take judicial notice, indicate that the Anthony trial took place April 16-27, 2007, shortly before Plaintiff ended his employment with SCDC. *See* 3:05-1636-MBS-BM, Dkt. Nos. 82-86, 88, 90, 92, 94.

**Civil Action and Workers' Compensation Claim.** Defendant initiated this civil action on December 18, 2007. *See* Dkt. No. 1. The Complaint appears to assert two causes of action: (1) a claim under 42 U.S.C. § 1983 for violation of Plaintiff's speech and associational rights granted by the First Amendment to the United States Constitution; and (2) a pendent state law claim for intentional infliction of emotional distress. *See* Dkt. No. 1 at 1, 3-4 (Compl. ¶¶ 3, 14, 16). Plaintiff seeks compensatory and punitive damages. *Id.* at 4 (Compl. ¶ 16).

In addition, Plaintiff filed a Workers' Compensation claim with the South Carolina Workers' Compensation Commission on December 15, 2008, nearly one year after commencement of the present case. Plaintiff's petition for a Workers' Compensation hearing states that Plaintiff suffers from post-traumatic stress disorder and psychological injury because he "was required to execute a number of condemned inmates without proper controls and safe guards [sic] . . . . If [Plaintiff] had refused to conduct the executions, it had been made clear by supervisors that his desirable employment would end . . . ." Dkt. No. 62-3 at 2. A joint Workers' Compensation hearing for Plaintiff and Baxley took place on June 5, 2009. *See* Dkt. No. 62-2 (WCC Trans.). The court is unaware of the outcome of Plaintiff's Workers' Compensation claim.

## STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). In a First Amendment retaliation case, the court "review[s] the record to determine whether a reasonable jury could conclude that [the adverse employment action] was substantially motivated by . . . protected speech . . . ." *Love-Lane v. Martin*, 355 F.3d 766, 780 (4th Cir. 2004) (internal quotations omitted).

**DISCUSSION**

Although the Complaint is somewhat vague as to the specific causes of action that Plaintiff intends to raise, it appears from various statements within the Complaint that Plaintiff intends to assert two claims. First, Plaintiff alleges that Defendants retaliated against him, in violation of the First Amendment, for two instances of protected speech: (1) comments regarding his participation in the execution of condemned inmates; and (2) his comments to Ward regarding Sheedy's use of a state-owned computer to view pornographic images. Dkt. No. 1 at 1-2 (Compl. ¶¶ 3, 9). Plaintiff also alleges that Defendants engaged in conduct that amounts to intentional infliction of emotional distress. *Id.* at 3-4 (Compl. ¶¶ 12-14).

**I. First Amendment Retaliation**

To make a *prima facie* case in support of his First Amendment retaliation claim, Plaintiff

9

must establish four elements: (1) The speech must have been protected expression, meaning that it related to a matter of public concern and was beyond Plaintiff's official duties; (2) Plaintiff's interest in exercising his First Amendment expression right must outweigh Defendants' interest in an efficient workplace;[6] (3) Plaintiff must have been deprived of a valuable benefit or adversely affected in a way that would chill exercise of his First Amendment rights; and (4) There must be a causal relationship between the protected expression and the deprivation or adverse employment decision. *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 351-52 (4th Cir. 2000) (listing elements). "[T]he first three elements are ultimately questions of law," while "[t]he fourth factor – one of causation – is one of fact." *Id.* at 352. If Plaintiff fails to establish any of these elements, his claim fails. "The order of inquiry may vary with the circumstances of the case." *Id.* (quoting *Daniels v. Quinn*, 801 F.2d 687 (4th Cir. 1986)).

**Protected Expression**. The Complaint does not specifically identify any instances in which Plaintiff engaged in protected speech. However, in his response to Defendants' summary judgment motion, Plaintiff claims that he engaged in two instances of protected speech: (1) expressing his disdain for performing executions to Ward and other SCDC officials; and (2) notifying Ward of inappropriate materials on Sheedy's computer. *Compare* Dkt. No. 1 *with* Dkt. No. 69 at 7-13.

*Complaints About Executions.* Plaintiff argues that his complaints about participating in executions were in the public interest, and therefore protected, for two reasons. First, he asserts that "[t]he public has a legitimate interest in knowing that those who serve as executioners do so under duress." Dkt. No. 69 at 12. Plaintiff also asserts that "[t]he public . . . has a legitimate interest in

---

[6] This element is also known as the *Pickering* balancing test, derived from *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). *See Love-Lane v. Martin*, 355 F.3d 766, 776 (4th Cir. 2004).

knowing that those who serve as executioners are not given proper training or counseling." *Id.* at 12-13.

With respect to the issue of inadequate training and counseling, Plaintiff's claim fails because, even if the court assumes that this issue is a matter of public concern, Plaintiff has not proffered evidence that he complained about these issues to Ward, Ozmint, other SCDC officials, or any persons outside of SCDC.

Plaintiff's claim regarding the issue of duress is likewise unavailing. In April and May 2004, Plaintiff participated in meetings with Ward and Baxley in which Plaintiff and Baxley expressed their personal discomfort with participating in executions. Dkt. No. 69-2 at 2, 4 (Pl.'s WCC Dep. at 81-82, 95-96). These complaints do not constitute protected speech because they do not address a matter of public concern. Although speech regarding participation in executions under duress may constitute expression regarding a matter of public concern under some circumstances, the "content, form, and context" of Plaintiff's statements to Ward and to other officials suggest that Plaintiff's execution-related complaints concerned only the narrow issue of his personal employment status within SCDC. *See Connick v. Myers*, 461 U.S. 138, 147-48 (1983). Plaintiff's internal personnel concerns are of limited interest to the public. *See Stroman v. Colleton County School Dist.*, 981 F.2d 152, 156 (4th Cir. 1992). Accordingly, the court finds that, to the extent Plaintiff made any statements regarding the performance of executions under duress, they do not constitute protected speech. Defendants' motion for summary judgment as to the execution issue, therefore, is granted.

***Reports About Inappropriate Use of State Computer.*** Plaintiff additionally asserts that he engaged in protected speech by notifying Ward that Sheedy had been using a state-owned computer to view and show pornography to other SCDC employees. Dkt. No. 1 at 4 (Compl. ¶ 15). Plaintiff

11

argues that his notification to Ward is protected speech because the public has an interest in knowing about misuse of state property.

The evidence proffered does not support Plaintiff's claim that he spoke out regarding improper use of state property. There are three instances cited by Plaintiff to support his pornography-related First Amendment claim. First, Plaintiff testified that, in response to Sheedy's invitation to view the pornography, he told Sheedy that he "did not appreciate it nor did [he] want to see that anymore," after which Sheedy no longer asked Plaintiff to view the images. Dkt. No. 69-2 at 15 (Pl.'s WCC Dep. at 161). Plaintiff's statement to Sheedy constituted only a statement of his personal disdain for pornography.

Second, Plaintiff participated in a meeting with Baxley and Ferraro in which Baxley shared pornographic images that he had collected from Sheedy's computer. While Baxley, by sharing this evidence and calling this meeting, may have spoken to an official regarding misuse of a state-owned computer, Plaintiff offers no evidence that he *personally* took part in that speech. Plaintiff testified only that he was present while Baxley showed Ferraro the evidence. *Id.* at 16 (Pl.'s WCC Dep. at 164). Plaintiff further testified that the purpose of the meeting was to discuss issues unrelated to pornography, and that he was not sure why Baxley shared the collected images during this meeting. *Id.* at 16 (Pl.'s WCC Dep. at 164). Plaintiff had no additional involvement with the pornography investigation or the images collected by Baxley. *Id.* (Pl.'s WCC Dep. at 165). The court therefore finds that, even if Sheedy's alleged use of a state-owned computer to store and transmit pornography were a matter of public concern, Plaintiff has not proffered evidence that he spoke to anyone in order to raise this concern. Plaintiff has offered no legal authority to support the proposition that an employee's mere presence while other employees speak on matters arguably of public concern may

12

constitute protected speech.

Third, Plaintiff claims that his comment to Ward during the *Anthony* trial constitutes protected speech because Plaintiff was "report[ing[ the misuse of state computers." Dkt. No. 69 at 10. However, Plaintiff testified that he told Ward about the images collected by Baxley "in fairness to him," because "they might be coming out in the courtroom." Dkt. No. 62-2 at 48 (WCC Trans. at 131); Dkt. No. 69-2 at 16 (Pl.'s WCC Dep. at 165-66). Plaintiff has also testified that, when he told Ward about the image collection during the *Anthony* proceedings, he believed the pornography investigation was "pretty much common knowledge" among several SCDC officials, including Ozmint. Dkt. No. 69-3 at 10 (Pl.'s Dep. at 59). By Plaintiff's own admission, he did not mention the pornography incident to any supervisory official, other than Sheedy himself, prior to the *Anthony* trial. *See* Dkt. No. 69-2 at 15 (Pl.'s WCC Dep. at 162). After careful consideration of this and other evidence, the court finds that Plaintiff's pornography-related comments do not constitute protected speech. The "content, form, and context" of the speech do not support Plaintiff's claim. *See Connick*, 461 U.S. at 147-48.

Accordingly, the court concludes that Plaintiff has not engaged in protected speech. Given this conclusion, it is not necessary to determine whether such speech caused Plaintiff to be deprived of a valuable benefit, or whether Plaintiff's interests in protected expression outweigh Defendants' interests in maintaining an efficient workplace.

## II. Qualified Immunity

Defendants argue that, even if the court finds their actions violated Plaintiff's First Amendment rights, they are entitled to qualified immunity. Dkt. No. 59-1 at 14. "Qualified immunity shields government officials performing discretionary functions from personal-capacity

13

liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ridpath v. Board of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006) (internal quotation marks omitted). Because Plaintiff does not satisfy the threshold by showing a constitutional violation, the court need not proceed to the second step of the qualified immunity analysis.

## III. Intentional Infliction of Emotional Distress

Plaintiff also asserts a pendent state claim against Defendants for intentional infliction of emotional distress ("IIED"). Plaintiff claims that Defendants required him to participate in executions against his will, and further claims that "[a]s a direct and proximate result" of the executions and the pornography investigation, "plaintiff has sustained the loss of his quality of life, shock, humiliation and embarrassment, as well as the loss of earning capacity." Dkt. No. 1 at 3-4 (Compl. ¶¶ 13-16).

Because IIED is a state cause of action heard in the federal court through its supplemental jurisdiction, the court applies South Carolina law to this claim. In order to state a claim for IIED (or "outrage") under South Carolina law, Plaintiff must show that:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was severe so that no reasonable [person] could be expected to endure it.

*Ford v. Hutson*, 276 S.E.2d 776, 778 (S.C. 1981) (internal citations and quotations omitted) (establishing, for the first time, elements of an IIED claim in South Carolina); *see also Hansson v. Scalise Builders of S.C.*, 650 S.E.2d 68, 71 (S.C. 2007). "[T]he defendant's conduct is to be judged

14

by an *objective standard*, i.e., whether it can reasonably be considered extreme, outrageous, and utterly intolerable in a civilized community." *Corder v. Champion Rd. Machinery International Corp.*, 324 S.E.2d 79, 81 (S.C. Ct. App. 1984) (emphasis added). "[T]he court determines whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, and only where reasonable persons might differ is the question one for the jury." *Strickland v. Madden*, 448 S.E.2d 581, 584 (S.C. Ct. App. 1994).[7]

Plaintiff's allegations of maltreatment after raising concerns about recruiting, pay, and other management issues are not sufficiently outrageous to support his IIED claim. Plaintiff claims only that Ward made him feel "less than a man" by directing him not to speak with another SCDC official, which "bothered [him] so much" that he mentioned this instruction to other SCDC officials. *See* Dkt. No. 69-2 at 8-9, 15 (Pl.'s WCC Dep. at 119-23, 158). However, though Ward's behavior may have caused Plaintiff some mental upset, it is not conduct that, viewed objectively, is "utterly intolerable in a civilized community." *Corder*, 324 S.E.2d at 81; *see also Gattison v. South Carolina State College*, 456 S.E.2d 414, 416-17 (S.C. Ct. App. 1995) (reviewing, in detail, what constitutes "outrageous conduct" according to South Carolina case law on IIED).

Plaintiff's participation in executions is likewise an insufficient basis for an IIED claim. Plaintiff alleges that Defendants required him to participate in executions against his will, for essentially two reasons: (1) when Plaintiff was interviewing to be a major with RRT, he believed

---

[7] Although, in the employment context, South Carolina's Workers' Compensation statute generally prohibits employee remedies other than those available under the Workers' Compensation program, it is nonetheless "well settled that a common law cause of action is not barred by [the exclusivity provision] *if the employer acted with a deliberate or specific intent to injure the employee*." *Peay v. United States Silica Co.*, 437 S.E.2d 64, 65 (S.C. 1993) (emphasis added); *see also* S.C. Code Ann. § 42-1-540. A claim for IIED would, by definition, require such an intent.

15

he would not receive the position unless he agreed to perform executions; and (2) once Plaintiff notified Ward that he no longer wished to perform executions, Ward allegedly told Plaintiff that if he did not perform executions, he could "go back down to the institution," meaning that Plaintiff would be sent back to work at a prison. *See* Dkt. No. 69-2 at 4 (Pl.'s WCC Dep. at 95-96); *see also* Dkt. No. 62-2 at 15-19 (WCC Trans. at 46-48, 50-51). Plaintiff also argues that his participation in executions was outrageous because he was exposed to emotionally troubling situations without preparation or training, among other reasons. *See* Dkt. No. 1 at 3 (Compl. ¶ 13).

These allegations are insufficient to support a finding that Plaintiff was forced to participate in executions. At most, he was given a difficult choice with emotional repercussions. Jobs, particularly jobs in the field of law enforcement, sometimes require such tough choices. The proffered evidence proves only, at most, that Plaintiff was given a choice between duty assignments: one more difficult and potentially more hazardous, but offering greater benefits and compensation; the other less emotionally trying, but with a corresponding reduction in pay and benefits. Even if Ward told Plaintiff that he would lose his position with RRT, state vehicle, and emergency pay if he declined to participate in executions at the May 2004 meeting, this type of employer conduct would not amount to the sort of extreme and outrageous conduct contemplated by the IIED cause of action.[8] *Cf. McSwain v. Shei*, 402 S.E.2d 890, 890-92 (S.C. 1991) (holding that a reasonable jury could determine that an employer was liable for IIED when the employer told plaintiff that she would be fired unless she repeatedly performed exercises that revealed her incontinence to bystanders and delayed surgery necessary to repair her bladder condition). The court therefore

---

[8] It is also of note that, as mentioned above, Plaintiff has testified that he faced no negative effects on his employment status after Ward stopped asking him to perform executions. *See supra* p. 5.

16

grants Defendants' motion for summary judgment as to Plaintiff's IIED claim.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **granted** in full.

**IT IS SO ORDERED.**

                                                    s/ Cameron McGowan Currie
                                                    CAMERON MCGOWAN CURRIE
                                                    UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
March 30, 2010